United States District Court
District of New Jersey

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph A. Dickson |
| v. | : | Magistrate No. 12-6564 |
| EUGENE WALI BRASWELL | : | CRIMINAL COMPLAINT |

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

From in or around September, 2011, through in or around March, 2012, in Essex County, in the District of New Jersey and elsewhere, defendant EUGENE WALI BRASWELL did:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHMENT B

JEFFREY KIDDER
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

March 16, 2012               at      Newark, New Jersey
Date                                 City and State

Honorable Joseph A. Dickson
United States Magistrate Judge
Name & Title of Judicial Officer          Signature of Judicial Officer

**ATTACHMENT B**

I, Jeffrey Kidder, am a Special Agent with the Federal Bureau of Investigation. Based upon my investigation and my discussions with other individuals involved in this investigation, I have knowledge of the following facts:

1. Beginning in or about September 2011, a co-conspirator of defendant EUGENE WALI BRASWELL (hereinafter "BRASWELL") who was incarcerated at a federal prison in North Carolina ("the co-conspirator") began discussions with another individual inside the prison ("the individual") about the purchase of multi-kilogram quantities of cocaine.

2. The co-conspirator began to arrange a deal with the individual whereby the individual would procure from his associates multi-kilogram quantities of cocaine. The agreement called for the co-conspirator to have his friend "Wali" in New Jersey purchase the cocaine from the individual's associate.

3. From recorded prison calls and emails from the co-conspirator to "Wali," the FBI determined that "Wali" is the defendant BRASWELL.

4. In recorded phone conversations in March, 2012, an FBI undercover agent, posing as the individual's associate, contacted defendant BRASWELL and, consistent with the deal worked out between the co-conspirator and the individual previously, agreed to purchase 25 kilograms of cocaine from the FBI undercover agent.

5. Numerous recorded calls before and after the communication described in paragraph 4 between the co-conspirator and defendant BRASWELL include discussions of the upcoming deal. For example, on March 10, 2012, the co-conspirator stated in substance, "It's a done deal, dude said they got 200 properties . . . international type shit, that's heavy." The co-conspirator also stated that BRASWELL "did not have to pay for all the houses up front." (The co-conspirator was telling BRASWELL that the individual had told him that 200 kilograms of cocaine had arrived from outside the country and that BRASWELL only had to pay for a portion of the cocaine and the rest could be given on consignment. "Properties" and "houses" are the same code words that the FBI undercover used when contacting BRASWELL. This is code for kilograms of cocaine.)

6. In a recorded conversation on March 13, 2012, the co-conspirator stated to BRASWELL, in substance, that BRASWELL "is about to make seven figures off these properties." The co-conspirator then stated, "It's a done deal," and BRASWELL

responded, "By Friday." The co-conspirator stated again, "It's a done deal, I know how this dude talks, I've been here with him. Now he's saying everything's there and isn't being touched, it's for you. With me doing the math, that's seven figures minimum." The co-conspirator then stated, "This week, he said they coming up there, the daughter is out of the picture." (The co-conspirator is telling BRASWELL that the deal was in place. BRASWELL is telling the co-conspirator the deal would take place "Friday" because that was what the FBI undercover agreed to with BRASWELL. The co-conspirator assures BRASWELL that the individual in prison with him has told him that the kilograms of cocaine have been brought to the New Jersey area and will not be distributed to anyone other than BRASWELL. The co-conspirator is also telling BRASWELL that their profit would be over a million dollars. The reference to "the daughter" refers to an earlier contact between the individual's daughter and Braswell by phone. BRASWELL was told that she would not be part of the actual meeting when the drugs were turned over to BRASWELL.)

7. On March 16, 2012, in a recorded conversation, the FBI undercover called BRASWELL to arrange to meet for the 25 kilograms deal. BRASWELL and the undercover met and, in a recorded conversation, BRASWELL requested that the first sale be for one kilogram in exchange for $14,000. BRASWELL showed the undercover a wad of $100 bills in his pocket and stated he was ready to do the one-kilogram sale, but the undercover had to wait for him to purchase the other 24 kilograms.

8. Later that same day, the undercover met again with BRASWELL, who showed the undercover money for the one kilogram deal. BRASWELL walked with the undercover to the undercover's car where the drugs were supposed to have been. BRASWELL was then arrested.

**ATTACHMENT A**

knowingly and intentionally conspire and agree with others to distribute and to possess with intent to distribute 5 kilograms or more of cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii), in violation of Title 21, United States Code, section 846.